UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| MICHAEL LANCASTER-WILLIAMS, ANTOINE TERRY, EDITH EVANS and GREGORY MOORE, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 08 C 7144 |
| v. | ) ) | Judge John W. Darrah |
| PODS ENTERPRISES, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Michael Lancaster-Williams ("Williams"), Antoine Terry, Edith Evans and

Gregory Moore, brought suit against their employer, PODS Enterprises, Inc. ("PODS").

Plaintiffs allege multiple violations of Title VII, including discrimination, hostile work

environment and retaliation on the basis of race, skin color and, in the case of Evans, gender.

Terry brings a claim under Illinois state law for retaliatory discharge. Evans also brings claims

under the Federal Equal Pay Act and the Illinois Equal Pay Act. Before the Court is Defendant's

Motion for Summary Judgment.

## BACKGROUND

### PODS

PODS is a provider of mobile storage and moving services for residential and business

customers. (Def.'s 56.1(a)(3) (Williams) at ¶ 4.) PODS's corporate office, including its human

resources department, is located in Clearwater, Florida. (*Id.* at ¶ 4.) At all times relevant to this

suit, PODS has operated five facilities/warehouses in the Chicago area. (*Id.* at ¶ 5.) Four of

these locations were in Illinois at Elgin, Carol Stream, Crete and Romeoville (later moved to

Woodridge); one is located in Portage, Indiana. (*Id.* at ¶ 5.) Since March 2006, Tim Kelly, who is Caucasian, has been the General Manager of PODS's Chicago facilities. (*Id.* at ¶ 10.)

PODS's corporate facilities are divided into the Eastern Region and the Western Region. (*Id.* at ¶ 7.) From 2006 through approximately April 2009, the Chicago facilities were in the Western Region. Gary Snipes, who is Caucasian, held the position of Regional Director of the Western Region from 2005 until approximately November 2009. (*Id.* at ¶ 7.) Snipes reported to the Vice President of Retail Operations, David Blake.[1] (*Id.* at ¶¶ 6, 7.) Blake was responsible for the operations of all corporate facilities, including those in Chicago. (*Id.* at ¶ 6.) All decisions on hiring, demotion, promotion, transfer, discipline, suspension and termination had to be approved by Blake. (*Id.* at ¶ 9.) Kelly reported to Snipes until November 2008. (*Id.* at ¶ 10.)

From 2006 through November 2008, PODS's corporate structure for its Chicago facilities was as follows: a Territory Manager, assisted by an Assistant Territory Manager, oversaw the day-to-day operations of the Chicago facilities. (*Id.* at ¶ 11.) In each warehouse, a Warehouse Supervisor assisted with the day-to-day operations of the warehouse. (*Id.* at ¶ 11.) In the Warehouse Supervisor's absence, a Warehouse assistant would perform the Warehouse Supervisor's duties. (*Id.* at ¶ 11.) Warehouse Supervisors did not have the authority to hire, demote, promote, transfer, discipline, suspend, or terminate employees. (*Id.* at ¶ 12.)

In early 2008, PODS split the territories in the Chicago area. Walter Fox, who had been Territory Manager for Chicago since October 2006, became Territory Manager for the Crete, Portage and Romeoville facilities. (*Id.* at ¶¶ 15, 16.) Kenneth Votava, who had been Assistant

---

[1] In early 2007, Blake's title changed from Vice President of Retail Operations to Senior Vice President of Retail Operations, but his duties did not change.

2

Territory Manager for Chicago, became Territory Manager for the Carol Stream and Elgin facilities. (*Id.* at ¶¶ 15, 16.) Both Fox and Votava thereafter reported to Snipes. (*Id.* at ¶ 16.)

In November 2008, PODS changed its corporate structure: PODS eliminated the Warehouse Supervisor and Territory Manager positions and created the position of Warehouse Manager. (*Id.* at ¶ 19.) Fox and Votava were both demoted and became Warehouse Managers of the Crete and Romeoville facilities, respectively. (*Id.* at ¶ 19.) The Warehouse Supervisors at the other three Chicago facilities were promoted to the newly created Warehouse Manager positions. In April 2009, PODS transferred the Chicago facilities to the Eastern Region. (*Id.* at ¶ 20.) At the same time, David Grose became Regional Director – Retail Operations for the Eastern Region and was therefore responsible for the Chicago facilities. (*Id.* at ¶ 20.)

From 2006 to the present, delivery drivers have been assigned to each Chicago warehouse. (*Id.* at ¶ 13.) Drivers are responsible for delivery of pickup of PODS brand containers to and from customer locations. (*Id.* at ¶ 13.)

## WILLIAMS

Plaintiff Williams is an African-American who is currently employed by PODS as a driver in the Woodridge facility. (*Id.* at ¶¶ 1, 23.) Williams began his employment with PODS in 2004 as a driver at the Carol Stream facility. (*Id.* at ¶ 23.) In approximately October 2004, Williams transferred to the Romeoville facility, where he continued to work as a driver. (*Id.* at ¶ 23.) Sometime between February and April 2005, Williams transferred to the Crete facility.

In June 2005, Blake promoted Williams to Warehouse Assistant at Crete. (*Id.* at ¶ 24.) However, in September 2005, Blake demoted Williams from Warehouse Assistant to driver. (*Id.* at ¶ 25.) At that time, Terry Eastling took over as the Crete Warehouse Supervisor. (*Id.* at ¶ 26.)

3

Prior to August 2008, PODS utilized a semi-truck in the Chicago area to transfer PODS brand containers among the Chicago warehouses. (*Id.* at ¶ 27.) Unlike PODS's other trucks used for customer deliveries, the semi-truck could hold numerous PODS brand containers at one time. (*Id.* at ¶ 27.) In June 2006, Williams became the semi-truck driver. (*Id.* at ¶ 28.) Williams received a $2.00-per-hour raise as a result of the new position. (*Id.* at ¶ 28.) In February 2007, PODS transferred the semi-truck from Crete to Romeoville. (*Id.* at ¶ 29.) As the semi-truck driver, Williams was also transferred to Romeoville. (*Id.* at ¶ 29.) In August 2008, PODS eliminated the semi-driver position. (*Id.* at ¶ 30.) As a result, Williams became a customer delivery driver at the Romeoville facility, and his pay was reduced by $2.00 per hour. (*Id.* at ¶ 30.)

In December 2005, the Warehouse Supervisor position at the Romeoville facility became available. (*Id.* at ¶ 37.) Williams wanted to apply for that position, but Votava, then a driver, received the position before Williams could apply. (*Id.* at ¶ 37.) In December 2007, Williams wanted to apply for the Crete Warehouse Supervisor position and was informed he needed to speak to Fox and Snipes about the position. (*Id.* at ¶ 38.) However, Williams did not submit an application for this position. (*Id.* at ¶ 38.) PODS hired Moore for the Crete position. (*Id.* at ¶ 38.)

Williams filed a charge of discrimination with the EEOC on October 24, 2007. (*Id.* at ¶ 49.) Williams' charge alleged that he had been subject to a hostile work environment and other related discriminatory actions on the basis of Williams' race. (*Id.* at ¶ 49.)

<u>MOORE</u>

Plaintiff Moore is an African-American who is currently employed as a driver at PODS. (Def.'s 56.1(a)(3) (Moore) at ¶ 1.) Moore began his employment with PODS on May 31, 2005, as a driver at the Crete facility. (*Id.* at ¶ 20.) In February 2007, Moore was promoted to Warehouse Assistant at the Crete facility. (*Id.* at ¶ 20.) On December 17, 2007, Moore was promoted to the Warehouse Supervisor position at the Crete facility. (*Id.* at ¶ 22.) In November 2008, Moore was demoted to driver due to the corporate restructuring. (*Id.* at ¶ 25.)

In October 2007, a Warehouse Supervisor position became available at the Romeoville facility. (*Id.* at ¶ 29.) At that time, Moore was working at the Crete facility. (*Id.* at ¶ 29.) Eastling, who was Warehouse Supervisor at the Crete Facility, failed to post any notice of the open Romeoville position. (Moore's 56.1(b)(3) at ¶ 21.) Moore knew of the open Romeoville position and expressed interest in the position to Eastling. (*Id.* at ¶ 21.) However, while Moore was waiting for the position to be posted, PODS hired another individual to fill the Romeoville vacancy. (*Id.* at ¶ 21.)

Moore filed a charge of discrimination with the EEOC on December 4, 2007. (Def.'s 56.1(a)(3) (Moore) at ¶ 78.) The charge alleged discrimination on the basis of race. (*Id.* at ¶ 78.)

<u>TERRY</u>

Terry began his employment with PODS on March 19, 2007, as a driver at the Crete facility. (Def.'s 56.1(a)(3) (Terry) at ¶ 29.) Terry reported to Eastling. (*Id.* at ¶ 30.) On June 13, 2007, less than three months after his employment began, Terry injured himself at work and was diagnosed with a shoulder strain, back pain and wrist pain. (*Id.* at ¶ 31.) Terry filed a worker's compensation claim on the date of the injury. (*Id.* at ¶ 31.) Terry continued to work

after the accident until July 13, 2007, when Terry's physician prohibited him from returning to work until he was seen by an orthopedic specialist. (*Id.* at ¶ 31.) On July 13, 2007, Terry's worker's compensation claim was approved, and he began receiving payments. (*Id.* at ¶ 36.)

On July 30, 2007, Terry was released to work with certain restrictions on use of his right shoulder. (*Id.* at ¶ 37.) Those restrictions were modified three times between that date and October 10, 2007. (*Id.* at ¶ 37.) However, Terry did not return to work at the Crete facility because he feared and distrusted Eastling. (*Id.* at ¶ 38.)

On October 16, 2007, Donna Lugo, then PODS's Benefits Manager, informed Terry that PODS had been informed of Terry's most recent medical restrictions. (*Id.* at ¶ 39.) Although PODS did not have any light-duty work available at the Crete facility, it offered Terry an administrative position in the Carol Stream location that fell within Terry's work restrictions. (*Id.* at ¶ 39.) PODS offered to compensate Terry for his mileage from his regular location (Crete) to Carol Stream. (*Id.* at ¶ 40.) When Terry informed Lugo that he could not commute to Carol Stream because he did not have a car, Lugo informed Terry that PODS would provide him with a company-paid rental car. (*Id.* at ¶ 40.)

Terry was scheduled to return to work November 2, 2007. (*Id.* at ¶ 41.) Terry arrived late because of traffic and his unfamiliarity with the route. (*Id.* at ¶ 41.) Terry did not show up for work on November 5 or 6. (*Id.* at ¶ 41.) On November 7, 2007, Terry discussed his absences with Lugo and Gary Foddrill, the Human Resource Manager. (*Id.* at ¶ 42.) Terry informed Lugo and Foddrill that his body did not feel well, that he was on medication and that he did not feel like driving back and forth to Carol Stream. (*Id.* at ¶ 42.) Terry asked Lugo to place him back at

the Crete facility. (*Id.* at ¶ 42.) Because PODS did not have any light-duty positions available in Crete, Terry was placed on medical leave. (*Id.* at ¶ 42.)

On December 13, 2007, Terry was released to work with restrictions that fell within his job duties as a driver. (*Id.* at ¶ 43.) Accordingly, Lugo informed Terry via letter that he was required to contact his manager and report to work immediately. (*Id.* at ¶ 43.) Terry called Moore, who was by then Warehouse Supervisor at Crete, and asked Moore when he could return to work. (*Id.* at ¶ 44.) According to Terry, Terry called Moore several times, and the last time they spoke, Moore told Terry that Terry's name was not on the list of active drivers. (Terry's 56.1(b)(3) at ¶ 16.) Terry understood this to mean that he had been terminated. (*Id.* at ¶ 16; Def.'s 56.1(a)(3) (Terry) at ¶ 44.)

On January 4, 2008, Laura Middaugh, Vice President of Human Resources, informed Terry via letter that PODS's management had not heard from Terry regarding his return to work despite PODS's December 13, 2007 letter. (Def.'s 56.1(a)(3) (Terry) at ¶ 45.) Middaugh's letter stated that Terry was required to contact PODS within three days after his receipt of the January 4, 2008 letter or PODS would consider him to have voluntarily resigned his position. (*Id.* at ¶ 45.) According to UPS's records, the Middaugh letter was delivered to Terry's house on January 8, 2008. (*Id.* at ¶ 46.) However, Terry alleges that he did not receive the letter. (*Id.* at ¶ 46.) Given the UPS records, Middaugh believed that Terry had received her January 4, 2008 letter but had failed to respond or return to work. (*Id.* at ¶ 47.) Therefore, PODS terminated Terry for job abandonment on January 11, 2008. (*Id.* at ¶ 47.)

Terry filed a charge of discrimination with the EEOC on August 23, 2007. (*Id.* at ¶ 50.) The charge alleged hostile work environment and discrimination on the basis of color and race. (*Id.* at ¶ 50.)

EVANS

Evans began her employment with PODS in April 2006 as a driver at the Crete facility. (Def.'s 56.1(a)(3) (Evans) at ¶ 20.) Evans took Family and Medical Leave Act ("FMLA") leave between July 16, 2007 and September 17, 2007. (*Id.* at ¶ 20.) Evans also took worker's compensation leave from January 2009 until April 2009 and from June 2009 through November 2009. (*Id.* at ¶ 20.) Evans reported to Eastling from April 2006 until November 2007. (*Id.* at ¶ 22.) Evans then reported to Moore from December 2007 until November 2008. (*Id.* at ¶ 22.) Thereafter, Evans reported to Fox. (*Id.* at ¶ 22.) Evans was promoted to Warehouse Assistant in December 2007. (*Id.* at ¶ 21.)

Evans filed a charge of discrimination with the EEOC on October 31, 2007 (*Id.* at ¶ 76.) The charge alleged discrimination on the basis of race, color and sex and retaliation. (*Id.* at ¶ 76.)

EVENTS AT PODS RELEVANT TO PLAINTIFFS' CLAIMS

On December 28, 2005, Shane Donnelly, a Caucasian driver at PODS, said to himself, "I'll fuck a nigger up." (Def.'s 56.1(a)(3) (Williams) at ¶ 39.) Moore overheard the comment. (*Id.* at ¶ 39.) Later that day, Williams and Moore overheard Donnelly tell Eastling that he was "going to fuck [Moore] up" if Moore complained about Donnelly's prior comment. (*Id.* at ¶ 39.) The same day, Moore reported Donnelly's comments to Jeffrey Hayes, the Warehouse Assistant at Romeoville. (Def.'s 56.1(a)(3) (Moore) at ¶ 35.) Hayes informed Moore that he would

8

investigate the incident, and Donnelly was suspended. (*Id.* at ¶ 35.) On December 30, 2005, PODS terminated Donnelly for making a racist comment.[2] (*Id.* at ¶ 35.)

Eastling was Crete Warehouse Supervisor from September 2005 through November 12, 2007. (Def.'s 56.1(a)(3) (Williams) at ¶¶ 25, 26, 54.) During his employment with PODS, Eastling used racially offensive terms, such as "coon-fucker" and "porch monkey." (Williams' 56.1(b)(3) at ¶ 24.) Eastling also showed PODS employees pictures of himself hunting. (*Id.* at ¶ 24.) Eastling stated to Terry that Eastling was good with a bow and arrow. (Terry's 56.1(b)(3) at ¶ 17.) Plaintiffs allege that they perceived Eastling's comments about hunting and weapons in conjunction with his racist comments to be threatening. Eastling is alleged to have made frequent racist comments during his employment with PODS. (Moore's 56.1(b)(3) at ¶ 8.)

On November 5, 2007, PODS received Williams' EEOC charge and began an investigation into Eastling. (Williams' 56.1(b)(3) at ¶ 49, 50.) Eastling admitted to watching a video by African-American comedian David Chappelle, titled "The Niggers," with Moore and Evans. (Def.'s 56.1(a)(3) (Williams) at ¶ 54.) PODS terminated Eastling on November 12, 2007. (*Id.* at ¶ 55.) PODS claims that Eastling was fired for showing the David Chappelle video. (*Id.* at ¶ 55.)

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cincinnati*

---

[2]PODS also terminated Hayes, an African-American, that same day. (Def.'s 56.1(a)(3) (Moore) at ¶ 35.) PODS maintains that Hayes was terminated for threatening Donnelly with bodily harm. Plaintiffs dispute PODS's justification for terminating Hayes.

*Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). Although the moving party is responsible for demonstrating to the court why there is no genuine issue of material fact, the nonmoving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the nonmoving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-27 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

## ANALYSIS

A Title VII plaintiff may proceed either under the direct method, by presenting evidence of discriminatory intent, or the indirect, burden-shifting method. *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1029 (7th Cir. 2003). Proceeding under the indirect method, a plaintiff must establish a *prima facie* case by showing: (1) membership in a protected class; (2) performance meeting the employer's legitimate expectations; (3) an adverse employment

10

action; and (4) similarly situated employees outside of the protected class who were treated more favorably. *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007.) If the plaintiff satisfies this burden, the employer then has the burden to articulate a legitimate, nondiscriminatory reason for its decision. *Id.* The plaintiff may then challenge that reason as a pretext for discrimination.

### Michael Lancaster-Williams

Plaintiff Williams alleges three claims against PODS, all under Title VII: harassment and hostile work environment on the basis of race (Count I), discrimination on the basis of race (Count II) and retaliation (Count VII).

*Race Discrimination - Count II*

Williams alleges that he suffered adverse employment actions when he was (1) demoted from Warehouse Assistant in September 2005, (2) omitted from consideration for the Romeoville Warehouse Supervisor position in December 2005, (3) involuntarily transferred from the Crete facility to the Romeoville facility in February 2007, (4) omitted from consideration for the Crete Warehouse Supervisor position in November 2007, (5) demoted from semi-driver to driver in August 2008, and (6) subjected to false and fabricated disciplinary actions.

Defendant argues that Williams cannot prevail on his claims based on his August 2008 demotion and his November 2007 failure to promote because they are not within the scope of Williams' EEOC charge, filed on October 24, 2007. Both of these alleged instances of discrimination occurred after the charge was filed. Therefore, they cannot be within the scope of the charge. *See Conner v. Illinois Dept. of Natural Resources*, 413 F.3d 675, 680 (7th Cir. 2005) (claim with factual basis post-dating EEOC charge could not be within scope of the charge).

11

Williams has not responded to this argument. Therefore, because these allegations were not within the scope of the EEOC charge, they cannot form the basis of Williams' discrimination claim.

Defendant argues that Williams' claims based on conduct from 2005 are not viable because they are outside the 300-day period immediately preceding the EEOC charge. A plaintiff may not recover for acts that occurred outside the 300-day window preceding his EEOC charge. *See Roney v. Illinois Dept. of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007) (*Roney*); 42 U.S.C. § 2000e-5(e)(1). Williams argues that under the continuing violation doctrine, otherwise time-barred acts may still be actionable. "The doctrine of continuing violation allows [a plaintiff] to delay suing until a series of acts by a prospective defendant blossoms into a wrongful injury on which a suit can be based." *Lewis v. City of Chicago*, 528 F.3d 488, 493 (7th Cir. 2008). This is not the situation here. Both Williams' September 2005 demotion and the December 2005 failure to consider him for promotion were discreet acts that were immediately apparent and, therefore, do not fall within the continuing violation doctrine. *See Roney*, 474 F.3d at 460. Thus, because Williams did not file a charge within 300 days, those claims are now barred.

This leaves Williams with two thus-far viable discrimination claims: the February 2007 involuntary transfer and the allegedly false and fabricated disciplinary actions. With respect to the former, Defendant argues that the transfer does not qualify as an adverse employment action. "A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities. While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772,

780 (7th Cir. 2007) (*Nichols*) (internal quotations and citations omitted). Adverse employment actions generally fall into one of three categories: (1) a decrease in compensation, including termination; (2) a lateral job transfer interfering with career prospects; and (3) a negative change in working conditions. *Id.* In the third situation, the change in working conditions must subject the employee to "a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." *Id.*

The transfer from the Crete facility to the Romeoville facility cannot be said to meet this standard. The only negative effect of the transfer cited by Williams was to extend his commute by fourteen miles. While this may have been an inconvenience, it does not rise to the level of a adverse employment action, as defined above.

Williams' final basis with respect to his discrimination claim is his allegation that he received false and fabricated disciplinary actions. However, "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001). Williams has not identified any tangible job consequences that resulted from the allegedly fabricated disciplinary actions.

Therefore, Defendant is awarded summary judgment on Williams' discrimination claim.

### Hostile Work Environment - Count I

Williams alleges that he was the frequent target of racial slurs made by Eastling, the Crete Warehouse Supervisor. Williams also alleges that he reported Eastling's behavior to various individuals in the PODS corporate hierarchy.

13

Defendant argues that Williams' harassment claim is "too incredulous to be presented to the jury" and that, therefore, summary judgment should be granted. Defendant points out that the managers to whom Williams alleges he reported the racial comments all deny ever receiving such complaints from Williams. Furthermore, Defendant points out that even the other Plaintiffs in this case do not claim that Eastling's racist behavior was as extensive as Williams alleges it was. No reasonable jury, Defendant argues, could believe Williams' version of events.

Because the facts relevant and material to this claim are in dispute, summary judgment is not appropriate. While Defendant may have a low opinion of Williams' credibility, that matter is for the jury to decide. Reviewing the record presented, the Court cannot say that Williams' verison of events is "so utterly implausible . . . that no rational person could believe it." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). Therefore, summary judgment is denied on Williams' hostile-work-environment claim.

*Retaliation - Count VII*

The factual contours of Williams' retaliation claim are ill-defined. In his response brief, Williams seems to assert that much of the same conduct by Defendant that formed the basis of Williams' race-discrimination claim, discussed above, also forms the basis for his retaliation claim. According to Williams, the following actions "were discriminatory and also had a retaliatory component:" (1) Williams' demotion from Warehouse Assistant in September 2005, (2) his involuntary transfer from the Crete facility to the Romeoville facility in February 2007, (3) his demotion from semi-driver to driver in August 2008, and (4) the false and fabricated disciplinary actions he received. Williams does not explicitly link many of these allegedly

14

retaliatory actions to any specific protected activity but, rather, asserts generally that they are in retaliation for the complaints about discrimination he has been making since September 2005.

Most of these acts cannot support a viable claim for retaliation. Williams' September 2005 demotion falls outside the 300-day period immediately preceding his EEOC charge and is therefore barred. As noted above, neither the February 2007 transfer nor the allegedly false disciplinary reports qualify as adverse employment actions. Thus, they cannot form the basis for a retaliation claim.

This leaves only Williams' claim that his demotion from semi-driver to driver in August 2008 was in retaliation for filing his EEOC charge. Williams was demoted when Defendant eliminated the semi-driver position. Defendant asserts that the position was eliminated after a cost-benefit analysis of having the semi-truck, including a consideration of its repair costs and limited frequency of use. However, Williams has introduced an email from Tim Kelly indicating that the one purpose in eliminating the semi-driver position would be to "move and take away semi driver pay from Michael Williams." This evidence is sufficient at the summary judgment stage to satisfy Williams' burden of showing a causal link between his protected activity and the adverse employment action. It is also sufficient to suggest that Defendant's proffered reasons for the elimination of the position are pretextual. While Kelly's email might be read to imply that cost savings were the motivating factor in the elimination of the semi-driver position, it might alternatively suggest that the desire to reduce Williams' pay was behind the decision. Therefore, Defendant's Motion for Summary Judgment with respect to this portion of Williams' retaliation claim is denied.

*Damages*

Defendant argues that Williams is not entitled to compensatory damages because he has not presented evidence of emotional distress. Defendant also argues that Williams cannot recover punitive damages because Defendant has undertaken good faith efforts to comply with Title VII. Considering the evidence presented and the resulting factual issues still in dispute, specifically, the extent of the harassing behavior to which Williams was subject and the extent to which Williams reported that harassment, summary judgment must be denied.

## **Gregory Moore**

Plaintiff Moore alleges three claims against PODS, all under Title VII: harassment and hostile work environment on the basis of race (Count I), discrimination on the basis of race (Count II) and retaliation (Count VII).

*Race Discrimination - Count II*

Moore alleges that Defendant discriminated against him by (1) assigning Moore less desirable routes and (2) preventing Moore from applying for a supervisory position at the Romeoville facility.[3]

---

[3]Moore also alleges that Defendant discriminated against Moore by disciplining African-American employees more harshly than Caucasian employees, by giving "add-ons" (more lucrative assignments) to Grabinski (a Caucasian employee) and by excessively monitoring James Milner, an African-American driver. Defendant argues that Moore has no evidence to support his claim of disparate treatment regarding discipline, relies purely on speculation to support his "add-on" assertion and cannot base his discrimination on action taken against a third party. Moore offers no response to these arguments and thus is deemed to have withdrawn his discrimination claim to the extent it is based on these allegations.

In his response brief, Moore alleges that upon being promoted to Warehouse Supervisor, he was given only a $1.00-per-hour raise while whites who had been similarly promoted received a $2.00-per-hour raise. However, the Amended Complaint does not state a claim for pay discrimination, and the allegation is outside the scope of Moore's EEOC charge.

Defendant argues that being assigned less desirable routes is not an adverse employment action and thus cannot form the basis of a discrimination claim. As noted above, a negative change in working conditions amounts to an adverse employment action only when it is a "humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [the] workplace environment." *Nichols*, 510 F.3d at 780. Moore argues that the decision to assign him longer routes in Chicago as opposed to shorter routes in the suburbs was intended to subject Moore to "degrading and unsafe working conditions." Moore's unsupported characterizations of the routes are not sufficient to avoid summary judgment. Moore fails to even suggest how the routes to which he was assigned were degrading or unsafe. The routes assigned to Moore were consistent with his job duties as a PODS driver; that he may have preferred different assignments does not give rise to a Title VII discrimination claim. *See Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004); *Nichols*, 510 F.3d at 780-81.

With respect to Moore's failure-to-promote claim, Defendant argues that because Eastling, the only person that Moore alleges discriminated against him, was not involved in the decision-making process, the claim must fail. Moore's argument, however, is not that Eastling decided who would be hired for the Warehouse Supervisor position at the Romeoville facility but, rather, that Eastling failed to post the notice of the position vacancy. The question, therefore, is, assuming for the moment that Eastling's motivation for failing to post the notice was discriminatory, whether Defendant can be held responsible for Eastling's act. That question turns on whether Defendant was aware of Eastling's conduct. *See Dunn v. Washington County Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005) ("the plaintiff bears the burden of showing that the employer knew of the problem"). Moore has presented no evidence, nor has he even alleged, that

Defendant was aware of Eastling's failure to post the position vacancy notice. Nor has Moore suggested any legal theory by which Defendant could be held liable under Title VII for Eastling's failure in this respect.

Furthermore, the undisputed facts of the case make it clear that race was not a factor in filling the Romeoville Warehouse Supervisor position. A Caucasian ultimately filled the position but only after an African-American driver was offered and turned down the position. Furthermore, Moore himself was promoted to the Warehouse Supervisor position in Crete only two months later. Thus, Moore cannot show that Defendant's failure to promote him to the Romeoville Warehouse Supervisor position was discriminatory.

Therefore, Defendant is entitled to summary judgment on Moore's discrimination claim.

### Hostile Work Environment - Count I

Defendant argues that Moore cannot show that he was subjected to severe or pervasive harassment. Defendant asserts that Moore's hostile work environment is based exclusively on only four inappropriate actions by Eastling: (1) making a racist comment about Devin Hester[4]; (2) calling an African-American driver a "stupid black nig"; (3) asking Moore how he could live in Gary, Indiana, which Eastling called a "ghetto filled with crime"; and (4) showing the David Chappelle video clip. Defendant argues that these four incidents over the course of four years, as a matter of law, cannot constitute severe or pervasive harassment.

Moore counters that his claim is not based on these four instances alone. First, contrary to Defendant's suggestion, Eastling commented negatively on Gary, Indiana, more than once. Moore testified at his deposition that Eastling made comments about Gary and "those types of

---

[4]Devin Hester is an African-American football player for the Chicago Bears.

things . . . quite often." Moore also alleges that Eastling frequently used the word "nigger."[5] Moore's allegations, disputed by Defendant, raise an issue of material fact that prevents a determination on summary judgment as to whether the comments to Moore constitute severe and pervasive harassment.

Defendant next argues that even if Eastling did create a hostile work environment, Defendant is not liable because Eastling was Moore's coworker, not his supervisor. In general, employers are vicariously liable for harassment perpetrated by supervisors but are liable for a coworker's harassment only when the employer has been negligent in either discovering or remedying the harassment. *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) (*Cerros*). Furthermore, an employer may avoid liability for harassment perpetrated by a supervisor by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (quoting *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998)).

It is unnecessary to decide at this stage whether Eastling was Moore's coworker or supervisor because disputed issues of fact would prevent summary judgment resolution of the claim in either case. Plaintiffs have alleged that Defendant received reports of Eastling's racist comments as early as September 2005. Thus, Defendant's negligence in discovering and remedying any harassment (if Eastling was a coworker) or, alternatively, Defendant's use of

---

[5]Defendant argues that this last allegation is not supported by Moore's deposition or any other part of the record. The Court disagrees. Moore's testimony that Eastling said "those types of things . . . quite often" is consistent with Moore's allegation. Moreover, Defendant points to nothing in the record contradicting Moore's allegation of Eastling's frequent use of the racial slur.

reasonable care to prevent and correct any harassment (if Eastling was a supervisor) are unresolved questions of fact. Therefore, summary judgment on Moore's hostile-work-environment claim is denied.

### *Retaliation - Count VII*

Defendant argues that Moore cannot prevail on his retaliation claim because he did not suffer any adverse employment action after filing his EEOC charge. Moore does not attempt to defend his retaliation claim. Therefore, summary judgment is granted with respect to that claim.

### *Damages*

Defendant argues that like Williams, Moore is not entitled to compensatory or punitive damages because Moore has not presented evidence of emotional distress and because Defendant has undertaken good faith efforts to comply with Title VII. As previously noted, the existence of disputed factual issues prevents resolution of this issue on summary judgment.

### **Antoine Terry**

Plaintiff Terry brings five claims against PODS under Title VII: harassment and hostile work environment on the basis of race and skin color (Counts I and III), discrimination on the basis of race and skin color (Counts II and IV) and retaliation (Count VII). Terry also brings a claim against PODS under Illinois state law for retaliatory discharge.

### *Race and Color Discrimination - Counts II and IV*

Terry alleges that Defendant discriminated against him on the basis of race and color by (1) assigning Terry to less desirable routes and (2) terminating Terry. As discussed above, assignment to less desirable routes does not constitute an adverse employment action. Thus, Terry's discrimination claims are limited to his termination.

Defendant argues that Terry's discrimination claims are barred because they are necessarily outside the scope of his EEOC charge. Terry filed his charge on August 23, 2007; he was terminated on January 11, 2008. Terry makes no convincing argument in response. It appears that Terry attempts to argue that his termination was reasonably related to the allegations in his charge and should thus be considered within the scope of the charge. *See Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005). However, Terry fails to back up this assertion with any supporting facts or analysis. Terry cites *Phelan v. Cook County*, 463 F.3d 773, 778 (7th Cir. 2006), for the proposition that "the goals behind the requirement of prior resort to administrative relief would be frustrated if the filing of a general charge with the EEOC would open up the possibility of judicial challenges to any related conduct that took place in connection with the employment relationship." To the extent this passage has any relevance, it would seem to cut against Terry's argument in that it explains the rationale for the rule that a plaintiff may not complain to the EEOC of certain instances of discrimination and then bring suit based on different discriminatory conduct. In any case, the alleged discriminatory conduct, Terry's termination, occurred four months after Terry filed his EEOC charge. Terry has not explained how the termination was reasonably related to the allegations in his charge. Therefore, the claim is procedurally barred.

Even if the claim were not procedurally barred, Terry would still not be able to avoid summary judgment. Terry admits that the only individual who discriminated against him while he was employed by Defendant was Eastling. Yet Eastling was terminated two months before Terry. Struggling to overcome this fact, Terry attempts to morph his discrimination claim into a claim for constructive discharge, asserting that he "was effectively discharged because he didn't

21

want to encounter Eastling at PODS." Putting aside the issue of whether Terry should be permitted to raise this entirely new theory at this late date, the constructive-discharge allegations directly conflict Terry's own version of events. Terry claims that starting December 13, 2007, he repeatedly called Moore to ask when he started work again. Thus, Terry's new constructive-discharge theory flatly contradicts his own earlier account of his termination.

Therefore, Defendant is entitled to summary judgment on Terry's discrimination claims.

### Hostile Work Environment - Counts I and III

Defendant argues that Terry cannot show that he was subjected to severe or pervasive harassment. That argument is not persuasive. Terry alleges that in the span of just one month, Eastling directed several racial slurs toward Terry. If this were not enough, at least two of Eastling's alleged racist remarks included threats to kill Terry. Thus, summary judgment based on the lack of severity of Eastling's claimed remarks is denied.

Defendant next argues that there is no basis to hold Defendant liable for Eastling's actions. As explained above, due to factual disputes regarding the nature of Eastling's conduct and the extent to which Defendant received notice of Eastling's behavior and took action to remedy it, summary judgment resolution of the hostile-work-environment claim is denied.

### Retaliation - Count VII

Defendant argues that Terry cannot prevail on his retaliation claim because (1) it is outside the scope of his EEOC charge because his termination occurred four months after the charge; (2) Terry has no direct proof of retaliation and thus cannot proceed under the direct method; (3) Terry has provided no evidence of similarly situated employees and thus cannot

proceed under the indirect method; and (4) even if Terry could establish a *prima facie* case, he cannot show that Defendant's reason for terminating him was pretextual.

In his response, Terry does not rebut these arguments. Rather, he again changes his allegations to argue that Defendant retaliated against him by forcing him to work light-duty in the Carol Stream, Illinois office. The undisputed facts of the case again contradict Terry's new assertions. Although he now claims to have been "forced" to take the Carol Stream position, in fact the position was *offered* to Terry because of his physical condition. As discussed above, Defendant offered to compensate Terry for his extra mileage from his regular location, the Crete facility. When Terry informed Defendant that he did not have a car to make the trip, Defendant offered Terry a company-paid rental car. Terry worked at the Carol Stream facility on November 2, 2007, but failed to report to work on November 5 or 6, 2007. When asked why he had not shown up to work, Terry replied that he did not feel well and did not want to make the drive. Terry requested to be placed back at the Crete facility. However, because Defendant did not have any light-duty positions available at Crete, Terry was placed on medical leave. These undisputed facts belie any suggestion or inference that Defendant retaliated against Terry for the EEOC charge.

Because Terry has failed to rebut Defendant's arguments with respect to retaliation, summary judgment is granted with respect to that claim.

### *State-Law Retaliatory Discharge - Count X*

To establish a claim for retaliatory discharge under the Worker's Compensation Act, 820 ILCS 305/1 et seq., a plaintiff must show (1) he was employed by defendant before or at the time of the injury, (2) he exercised some right granted by the Act, and (3) his discharge was causally

related to the exercise of that right under the Act. *Paz v. Commonwealth Edison*, 314 Ill.App.3d 591, 594 (2d. Dist. 2000). Defendant argues that Terry has failed to show a causal connection between his pursuit of worker's compensation benefits and his termination. In his response, Terry fails to respond to this argument, thereby conceding that he cannot show the requisite causal connection. Instead, Terry suggests that Defendant violated the Worker's Compensation Act by making him work outside his medical restrictions in Crete and by making him work in Carol Stream. This revised legal theory is insufficient to withstand summary judgment. Terry labels Count X as "Retaliatory Discharge." He cannot now modify that claim to allege injury other than his termination. Therefore, summary judgment is granted as to Terry's state-law retaliatory-discharge claim.

### *Damages*

Defendant argues that Terry is not entitled to compensatory or punitive damages because he has not presented evidence of emotional distress and because Defendant has undertaken good-faith efforts to comply with Title VII. As previously noted, the existence of disputed factual issues prevents resolution of this issue on summary judgment.

### **Edith Evans**

Plaintiff Evans brings seven claims against PODS under Title VII: harassment and hostile work environment on the basis of race, skin color and gender (Counts I, III and V); discrimination on the basis of race, skin color and gender (Counts II, IV and VI); and retaliation

(Count VII).  Evans also brings claims for violations of the Federal Equal Pay Act (Count VIII) and the Illinois Equal Pay Act (Count IX).[6]

### Race, Color and Gender Discrimination - Counts II, IV and VI

Evans alleges that Defendant discriminated against her by (1) assigning her less desirable routes, (2) assigning Evans to clean the bathrooms, and (3) paying her less.[7]  As discussed above, being assigned to less desirable routes is not an adverse employment action.  Thus, Evans cannot prevail on her claim on that basis.  Defendant also argues that being assigned to clean bathrooms is not an adverse employment action.  However, Defendant offers no legal authority in support of this assertion.  Again, as noted above, changes to the workplace environment that are humiliating or degrading may qualify as adverse employment actions.  *Nichols*, 510 F.3d at 780.  Defendant has not shown that being assigned to clean bathrooms on account of one's gender is, as a matter of law, not humiliating or degrading.

Defendant next argues that Evans cannot prove discrimination through either the direct or indirect method.  Evans argues that discriminatory intent can be inferred from Eastling's comments.  Specifically, Evans alleges that Eastling made multiple comments regarding what work was suitable for women.  Combined with Evans' claim that Eastling assigned Evans, but no male employees, the task of cleaning the bathroom, Evans has presented sufficient evidence of

---

[6]Evans mistakenly captioned Count IX as a claim under the Illinois Wage Payment and Collection Act and corrects this error only in her response.  Defendant argues that it is too late for Evans to raise a new theory of liability.  However, because Evans mentioned the correct statute in the body of the claim and because Defendant will suffer no prejudice from allowing the correction – both the Federal and Illinois Equal Pay Acts are analyzed in the same way – the error will be excused.

[7]Evans' pay-discrimination claims, including her Title VII claim, are addressed separately, below.

discrimination to avoid summary judgment on her gender-discrimination claim. However, Defendant is awarded summary judgment on Evans' race- and color-discrimination claims.

*Hostile Work Environment - Counts I, III and V*

Defendant argues that Evans cannot show that she was subjected to severe or pervasive harassment. As noted above, Evans alleges that she suffered harassment on account of both her race/color and her gender. With respect to the former, Evans has demonstrated harassment that is sufficiently severe and pervasive to withstand Defendant's Motion for Summary Judgment. Evans alleges that in addition to being forced to endure Eastling's racist comments, she had her car scratched by a coworker, Harold Grabinski, who was motivated by Evans' race. Evans alleges that when she complained about Grabinski, Walter Fox, who came to Crete to investigate Evans' allegations, told her that Grabinski's hatred ran "deeper than the KKK['s]."

However, Evans' allegations with respect to gender-based harassment do not rise to the level of pervasive or severe. According to Evans, Eastling (1) asked why Evans took eight weeks of FMLA leave for a hysterectomy, (2) asked Evans why her husband would want her to be a truck driver and stated that it was not a woman's position, and (3) stated that he needed to send a man for a certain job because it was not "something for a woman." These three comments over the course of Evans' employment cannot be said to constitute severe or pervasive harassment. *See Patt v. Family Health Systems, Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight gender-related comments were too isolated and sporadic to constitute severe or pervasive harassment).

Finally, Defendant argues that there is no basis to hold Defendant liable for any harassment Evans endured. For the reasons discussed above, this argument is not persuasive.

26

Therefore, Defendant's Motion for Summary Judgment is granted as to Count V but denied as to Counts I and III.

*Retaliation - Count VII*

Defendant argues that Evans cannot prevail on her retaliation claim because she stated at her deposition that Defendant had not retaliated against her:

Q:    And are there any ways that you feel that you've been retaliated against at PODS?
A:    Not yet.
Q:    None as of today?
A:    None as of today.

Evans does not address the issue in her response and has therefore conceded the issue.

Therefore, Defendant is entitled to summary judgment on Evans' retaliation claim.

*Pay Claims - Counts VI, VIII and IX*

Evans' pay-discrimination claims are based entirely on her contention that she was prevented from taking a "Level 1" computer course that would have allowed her to obtain a $0.25-per-hour raise. Evans claims that when she logged in to the PODS intranet, the course was unavailable to her. However, as demonstrated by her deposition testimony, Evans has no evidence supporting her contention that her inability to access the course was due to discrimination:

Q:    But it's your testimony that when you logged in with your number after your first six months of employment that the Level 1 was not available for you?
A:    Correct.
Q:    Do you have any facts to support it could be anything but a mistake?
A:    I have no idea?
Q:    Right. You don't know if it's sex discrimination, right?
A:    Right.
Q:    You don't know if it's race discrimination, right?
A:    Right.

Q:    You don't know if it's just a mistake?
A:    Correct.

Evans has offered no evidence that the unavailability of the Level 1 class was anything other than

a mistake.  Because her pay-discrimination claims are all entirely based on her unsupported

contention that Defendant discriminated against her by failing to make the Level 1 course

available, Defendant is awarded summary judgment on those claims.

### *Damages*

Defendant argues that Evans is not entitled to compensatory or punitive damages because

she has not presented evidence of emotional distress and because Defendant has undertaken

good-faith efforts to comply with Title VII.  As previously noted, the existence of disputed

factual issues prevents resolution of this issue on summary judgment.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted with respect to Plaintiffs' race discrimination claims (Count II); Plaintiffs' color discrimination claims (Count IV); Plaintiffs' retaliation claims, except as stated below (Count VII); Evans' gender-based hostile-work-environment claim (Count V); Evans' claims under the Federal Equal Pay Act (Count VIII) and the Illinois Equal Pay Act (Count IX); and Terry's state-law retaliatory-discharge claim (Count X.)

Defendant's Motion for Summary Judgment is denied as to Plaintiffs' hostile-work-environment claims based on race (Count I) and color (Count III); Williams' retaliation claim, to the extent that claim is based on his demotion from semi-driver to driver (Count VII); and Evans' gender-discrimination claim, to the extent that claim is based on being assigned different job responsibilities based on her gender (Count VI.)

Dated: _June 10, 2010_

_JOHN W. DARRAH_
United States District Court Judge

29